IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| BENONI AMPONSAH, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| | : | 1:14-CV-03314-LMM |
| v. | : | |
| | : | |
| DIRECTV, LLC, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## **ORDER**

This case comes before the Court on Defendants DirecTV, LLC and MasTec North America, Inc.'s Motion for Summary Judgment [116]. Plaintiffs, each of whom worked as satellite technicians, filed this case on October 15, 2014, alleging that Defendants willfully violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, by failing to make required minimum wage and overtime payments to Plaintiffs. Dkt. Nos. [1, 54]. Defendants, however, assert that Plaintiffs are not entitled to relief under the FLSA for six reasons: (1) Plaintiffs were independent contractors, not employees, and thus outside the scope of the FLSA; (2) neither Defendant qualifies as a "joint employer" of any Plaintiff; (3) even if Plaintiffs were employees and Defendants their employers, they fall within FLSA Section 207(i)'s exemption; (4) Plaintiffs cannot establish either Defendant's actual or constructive knowledge of the hours worked by Plaintiffs; (5) Plaintiffs cannot

identify any provable damages; and (6) some of Plaintiffs' claims are outside of the applicable statute of limitations. Dkt. No. [116-1] at 2–3, 70. After due consideration, the Court enters the following Order.

## I. BACKGROUND[1]

As described above, Plaintiffs brought this case against Defendants, claiming that Defendants employed them and failed to pay them minimum wage and overtime pay as required under the FLSA. Plaintiffs Amponsah, Exum, Hodges, Tchaas, and Velez each bring claims solely against Defendant DirecTV. Dkt. No. [172-1] ¶ 9. Plaintiffs Davila, Fennell, Jelks, McWilliams, and Pegues each bring claims against both Defendants. Id. ¶ 10. Defendants have raised six defenses in their Motion that they argue merit the Court granting summary judgment against Plaintiffs.

Defendant DirecTV is a leading provider of digital television entertainment, which is distributed to customers primarily by satellite. Dkt. No. [141-21] at 5 (DirecTV 2014 Annual Report). When someone orders DirecTV service, equipment must be installed at the customer's location. Dkt. No. [172-1] ¶ 13. A division of Defendant DirecTV called "DirecTV Home Services" hires satellite technicians to perform equipment installations. Id. Defendant DirectTV directly employs over 4,500 technicians and utilizes another 10,000 technicians through contracted Home Service Providers ("HSP"), one of which is Defendant MasTec. Dkt. Nos. [141-21] at 7; [174-1] ¶¶ 3, 5. Defendant MasTec is Defendant

[1] The facts in this section are undisputed unless otherwise indicated.

DirecTV's exclusive HSP for certain geographic areas. Id. ¶ 37. The vast majority of Defendant MasTec's revenue comes from Defendant DirecTV. Id. Defendant DirecTV's HSPs, including Defendant MasTec, routinely subcontract installation work out to various companies. Dkt. No. [172-1] ¶ 18. Defendant MasTec also employs some of its own technicians directly. Dkt. No. [174-1] ¶ 13.

The relationship between Defendants DirecTV and MasTec is governed by a written contract referred to as an "HSP Agreement." Id. ¶ 16; see Dkt. No. 142-10 (MasTec HSP Agreement). The HSP Agreement provides:

> Contractor is an independent contractor authorized during the term hereof to perform and provide Services to DIRECTV. Except as otherwise expressly provided herein, Contractor shall have full control over the methods, techniques, sequences, and procedures of the Services to be provided hereunder. This Agreement is intended to create an independent contractor relationship between the parties for purposes of federal, state and local law, including the Internal Revenue Code of 1986, as amended. . . . Because Contractor and Contractor's employees and subcontractors are not employees, franchisees, agents or otherwise of DIRECTV, Contractor and its employees and subcontractors are not entitled to any benefits to which DIRECTV employees may be entitled under DIRECTV policies or as otherwise required by law.

Id. ¶ 19. The HSP Agreement requires Defendant MasTec to use Siebel, Defendant DirecTV's work order management system, and "keep accurate and complete books and records regarding the performance of its obligations under this Agreement." Id. ¶¶ 2(a)(i), 2(d); Dkt. No. [172-1] ¶ 22.[2] Defendant DirecTV pays Defendant MasTec for completed work orders according to a "Rate Matrix"

---

[2] Siebel assigns work orders based on a "technician profile," which consists of the "three S's": (1) the technician's service area; (2) schedule; and (3) skill set. Dkt. No. [172-1] ¶ 24.

in the HSP Agreement. Dkt. No. [142-10] at 53–56. The HSP Agreement also contains an exclusivity provision that provides that "during the term of this agreement, Contractor agrees that neither it, nor its parent entities, subsidiaries or affiliates, shall perform installations or Services for any other provider or distributor of products which compete with DIRECTV's programming services or any other DIRECTV product or service." Id.¶ 10. This provision also applies to Plaintiffs, as it states that "a Contractor employee trained to provide Services pursuant to this Agreement shall not simultaneously provide Services, on behalf of Contractor, for a cable company or a provider of telephone services, and vice versa." Id.[3]

The HSP Agreement establishes many requirements for Defendant MasTec's technicians. It sets out the required elements of a DirecTV installation in a highly detailed "statement of work." Dkt. Nos. [174-1] ¶ 9b; [142-10] at 19. The HSP Agreement requires that Defendant MasTec hire only technicians who successfully complete Satellite Broadcasting and Communications Association Certified Installer Training; clear a criminal background check; pass a 9-panel drug screening test; and complete a DirecTV-approved training program. Dkt. Nos. [142-10] at 27–28; [174-1] ¶ 9c. It also requires Defendant MasTec's technicians wear DirecTV identification badges as well as "no less than the approved" DirecTV shirt, jacket, cap, and pants while performing any DirecTV

---

[3] The parties dispute whether the exclusivity provision was actually enforced. Dkt. No. [174-2] ¶ 6.

services. Dkt. No. [142-10] at 28–29. Defendant MasTec must ensure that all of its technicians "strictly adhere to the DIRECTV Personal Grooming Standards." Id. at 29. It must also "outfit all employee technicians with a laptop computer or other approved web-based, handheld device capable of receiving, modifying, and closing Work Orders in the field." Id. ¶ 2(a)(i). Further, "no less than seventy percent (70%) of all work orders shall be carried out by technicians driving vehicles meeting DIRECTV's standards." Id. at 28. That means that at least 70% of technicians' vehicles must be "new or like-new and damage-free, OSHA-compliant, white vans or trucks with matching, white truck-bed shell." Id. Under the agreement, all of Defendant MasTec's vehicles used for DirecTV services must display a DirecTV logo as well as Defendant MasTec's name and phone number. Id.

In turn, the relationships between HSPs like Defendant MasTec and its subcontractors are governed by written contracts referred to as "Home Services Subcontractor Agreements," which mirror Defendant DirecTV's agreements with its own subcontractors. Dkt. Nos. [172-1] ¶ 19; [174-1] ¶ 10. This agreement requires, among other things, that any subcontractor and its employees follow all rules and policies of Defendant DirecTV. Dkt. Nos. [174-1] ¶ 11; [142-51] ¶ 8. It also states that Defendant DirecTV has the right to audit any subcontractor's compliance with the agreement. Dkt. Nos. [174-1] ¶ 12; [142-51] ¶ 8. Further, the agreement says that subcontractors are independent contractors and contains a non-competition clause. Dkt. No. [142-51] ¶¶ 9–10.

All ten Plaintiffs in this case were satellite technicians. Five of them—

Plaintiffs Amponsah, Exum, Hodges, Tchaas, and Velez—worked for Defendant

DirecTV's contractors. Dkt. No. [172-1] ¶¶ 25, 29, 33, 41, 43.[4] And five of them—

Plaintiffs Davila, Fennell, Jelks, McWilliams, and Pegues—worked for Defendant

MasTec's various subcontractors. ¶¶ 27, 31–32, 35, 37, 39.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed

R. Civ. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to

find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986). A fact is "material" if it is "a legal element of the claim under the

applicable substantive law which might affect the outcome of the case." Allen v.

Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the Court, by

reference to materials in the record, that there is no genuine dispute as to any

material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co.,

---

[4] Specifically, Plaintiff Amponsah completed work for Future Satellite
Technologies. Dkt. No. [172-1] ¶ 25. Plaintiff Exum completed work for Modern
Day Satellite. Id. ¶ 29. Plaintiff Hodges completed work for Global Connected
Satellite. Id. ¶ 33. Plaintiff Tchaas completed work for Modern Day and DCI
Broadband, Inc. Id. ¶ 41. Plaintiff Velez completed work for H.D. Experts, Inc.,
Synergies3 Tec Services LLC, and White Communications, Inc. Id. ¶ 43.

357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." <u>Celotex Corp.</u>, 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. <u>Johnson v. Clifton</u>, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. <u>Id.</u> (citations omitted). All reasonable doubts, however, are resolved in the favor of the non-movant. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993).


## III.    DISCUSSION

Defendants raise five defenses, each of which they argue is independently sufficient to foreclose Plaintiffs' claims: (1) Plaintiffs were independent contractors, not employees, and thus outside the scope of the FLSA; (2) neither Defendant qualifies as a "joint employer" of any Plaintiff; (3) even if Plaintiffs

were employees and Defendants their employers, they fall within FLSA Section 207(i)'s exemption; (4) Plaintiffs cannot establish either Defendant's actual or constructive knowledge of the hours worked by Plaintiffs; and (5) Plaintiffs cannot identify any provable damages. Dkt. No. [116-1] at 2–3, 70. Defendants also argue, in the alternative, that some of Plaintiffs' claims are outside of the applicable statute of limitations. Id. at 70. The Court will discuss each issue in turn.

### A. Employee or Independent Contractor

First, Defendants argue Plaintiffs were each independent contractors. The FLSA's overtime and minimum wage protections extend only to "employees." See 29 U.S.C. §§ 206, 207. As defined by the FLSA, an "employee" is "any individual employed by an employer." Id. § 203(e)(1). The FLSA defines an "employer" as including "any person acting directly or indirectly in the interest of an employer in relation to an employee." Id. §203(d). The term "employ" "includes to suffer or to permit work." Id. § 203(g). The Supreme Court has held that these definitions are "comprehensive enough" to include "working relationships" as within the employer-employee category, but are not so broad as to include independent contractors. Rutherford Food Corp. v. McComb, 331 U.S. 722, 728–29 (1947).

The Eleventh Circuit has held that to determine whether someone falls within the category of a covered "employee" or an exempted "independent contractor," "courts look to the 'economic reality' of the relationship between the alleged employee and alleged employer and whether that relationship

demonstrates dependence." <u>Scantland v. Jeffry Knight, Inc.</u>, 721 F.3d 1308, 1311 (11th Cir. 2013). Six nonexclusive factors guide this inquiry:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; (6) the extent to which the service rendered is an integral part of the alleged employer's business.

<u>Id.</u> at 1312. The Eleventh Circuit has also instructed that while these six factors may serve as guides, no one factor is controlling and "the overarching focus of the inquiry is economic dependence." <u>Id.</u> Importantly, "[t]his inquiry is not governed by the 'label' put on the relationship by the parties or the contract controlling the relationship." <u>Id.</u> at 1311.

### 1. Control

The first factor considers the nature and degree of the alleged employer's control as to the manner in which the work is to be performed. <u>Id.</u> at 1313. "Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." <u>Usery v. Pilgrim Equip. Co., Inc.</u>, 527 F.2d 1308, 1312–13 (5th Cir. 1976).[5]

According to Plaintiffs, Defendants exerted significant controls over their hours. Plaintiffs assert that Defendant DirecTV used Siebel to assign Plaintiffs

---

[5] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. <u>Id.</u> at 1209.

daily work orders, Dkt. No. [174-1] ¶ 41; Defendants expected all technicians to be on-site at their first job of the day by 8:00 A.M., id. ¶ 58; and Defendants required any days that Plaintiffs took off to be reported to them and recorded in the Siebel system, id. ¶¶ 44–45. Defendants dispute all of these facts. They maintain that the subcontractors set the schedules and days of work (including days off) and deny that subcontractor technicians were required to meet Defendant DirecTV's in-house technician requirement of being on-site at 8:00 A.M. for each day's first job. Id. ¶¶ 41, 44–45, 58.

Further, Plaintiffs contend that Defendants controlled the method and manner of their work. Specifically, Plaintiffs assert that Defendants imposed mandatory standards for how Plaintiffs performed their work orders; how they spoke to customers; how they dressed; and what cars they drove. Id. ¶¶ 46, 54–56. Plaintiffs were also subject to periodic inspections by Defendant DirecTV's auditors. Id. ¶ 89. Defendants concede that Plaintiffs were held to strict installation standards and quality metrics, but argue that these requirements were aimed at customer satisfaction, not control of Plaintiffs. Id. at 10 (citing Freund v. Hi-Tech Satellite, Inc., 185 F. App'x 782, 783 (11th Cir. 2006) (per curiam)). But the Eleventh Circuit has held that "[t]he economic reality inquiry requires [the Court] to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised control." Scantland, 721 F.3d at 1316. Indeed, where "the nature of a business requires a company to exert control over workers" to too great of an extent, "then that company must hire employees,

not independent contractors." Id. The Court therefore finds that there are genuine issues of material fact as to this factor.[6]

### 2. *Opportunity for Profit*

Second, the Court considers the alleged employees' opportunity for profit or loss depending on their managerial skill. Id. Defendants argue that Plaintiffs were independent contractors because they were able to earn greater profits if they worked more effectively and efficiently as they were paid on a per-job basis. Dkt. No. [116-1] at 11. But this argument misses the point of this factor. The Eleventh Circuit has held that the relevant inquiry is *not* whether a plaintiff could "complete more jobs than assigned," but rather the extent to which a plaintiff "operates his own business." Scantland, 721 F.3d at 1316–17.

Plaintiffs point out that the parties dispute whether Plaintiffs were subject to an exclusivity clause in their agreements. Dkt. No. [174-1] ¶ 107. If Plaintiffs were indeed held to an exclusivity provision, then their ability to profit did not solely depend on their efficiency but rather the needs of Defendants. See

---

[6] Defendants also cite specific facts for each individual Plaintiff on each individual factor. The Court finds that it is not necessary to wade into these factual assertions because other genuine issues of fact that are applicable to all Plaintiffs preclude summary judgment. And in any event, most of Defendants' Plaintiff-specific factual assertions are hotly contested and the subject of further genuine issues of material fact. For example, on the control factor, Defendants claim that Plaintiff Amponsah testified that he did not feel Defendant DirecTV was his employer and that he controlled his own flexible schedule. Dkt. No. [116-1] at 15–16. Disputing these assertions, Plaintiffs point out that Plaintiff Amponsah only testified that he "had no idea" if Defendant DirecTV was his employer, but that all his work was for Defendant DirecTV, and that, although he understood he was supposed to be an independent contractor with a flexible schedule, in practice "[i]t's a whole different situation." Dkt. No. [172-1] ¶¶ 277–80.

Scantland, 721 F.3d at 1317 (holding plaintiffs' opportunity for profit was "limited by the number and types of jobs [defendant] assigned them and whether [defendant's] assigned schedule permitted them time to do so"). Defendants also concede that they set the rates Plaintiffs could charge consumers. Dkt. No. [174-1] ¶ 106; see Scantland, 721 F.3d at 1317 (holding that plaintiffs has a lessened opportunity for profit where "[t]echnicians could not negotiate or otherwise determine the rates they were paid for jobs"). The Court thus finds that there are genuine issues of material fact as to this factor.

### 3.    *Investment in Equipment or Materials*

The third factor is the alleged employee's investment in equipment or materials required for his task. Scantland, 721 F.3d at 1317. The Court's analysis with regard to this factor is informed by the Eleventh Circuit's decision in Scantland. In Scantland, the plaintiffs were cable, internet, and digital phone service technicians for a cable company's contractor. Id. at 1310. The plaintiffs were required to provide their own vehicles, insurance, and tools, but the cable company provided all of the equipment that was installed in customers' homes. Id. at 1317. The Eleventh Circuit recognized that on these facts, the plaintiffs had invested more in each job, but held that "these expenditures seem to detract little from the worker's economic dependence on [the cable company]." Id. The court therefore concluded that the investment in equipment or materials factor weakly favored independent contractor status with minimal weight on the overall analysis. Id.

The Court reaches the same conclusion in this case. Much like Scantland, as Defendants point out, each Plaintiff drove his own vehicle and purchased his own tools and supplies. Dkt. No. [116-1] at 11–12. However, Defendants concede that Defendant DirecTV owned all of the equipment that Plaintiffs installed. Dkt. No. [174-1] ¶ 116. Given these competing investments in equipment and materials, the Court finds that this factor weakly weighs in favor of independent contractor status, but affects the overall analysis only minimally because "these expenditures seem to detract little from the worker's economic dependence." See Scantland, 721 F.3d at 1318.

### 4. Special Skill

The fourth factor the Court considers is whether the service rendered required a special skill. Id. Plaintiffs acknowledge that they were required to perform skilled labor in their work for Defendants. Dkt. No. [172] at 21. Although they argue that Defendants provided them with these skills through mandatory training, many Plaintiffs concede that they brought previously gained skill and experience with them from prior employment. See id.; Dkt. No. [174] at 10. The Court therefore finds this factor favors independent contractor status.

### 5. Permanency and Duration

The fifth factor considers the degree of permanency and duration of the working relationship. Scantland, 721 F.3d at 1318. The Court finds there are genuine issues of material fact as to this factor. Plaintiffs' work relationships were generally short and transient: five Plaintiffs performed satellite installations for

less than a year, and four of them often moved from company to company. <u>See</u> Dkt. No. [116-1] at 15. However, the Eleventh Circuit has emphasized that when considering this factor, "[e]xclusivity is relevant." <u>Scantland</u>, 721 F.3d at 1319. And as set out above, there is a genuine issue of material fact as to whether Plaintiffs were in an exclusive arrangement with Defendants. The Court therefore cannot fully evaluate this factor on summary judgment.

### 6. *Integral Part of the Business*

The sixth and final factor considers the extent to which the service rendered is an integral part of the alleged employer's business. <u>Id.</u> As Defendants concede, "the work performed by Plaintiffs was undoubtedly important to DirecTV's satellite television service business, and to the fulfillment business of MasTec." Dkt. No. [116-1] at 15. Neither do Defendants dispute that installation technicians, including Plaintiffs, are often the only representatives of Defendant DirecTV that have personal contact with customers. Dkt. No. [174-1] ¶ 119. The Court finds that this factor favors employee status.

### 7. *Conclusion*

In sum, one factor favors employee status, one factor favors independent contractor status, one factor weakly favors independent contractor status, and there are genuine disputes of material fact as to three of the factors that guide the Court's inquiry. Because half of the factors the Eleventh Circuit has recognized as guides to determine whether someone is an employee or independent contractor

are the subject of genuine disputes of material fact, the Court concludes that summary judgment is not appropriate on this basis.

### B. Joint Employment

Defendants next argue that neither of them were a joint employer of Plaintiffs. For purposes of the FLSA, an employee may have more than one employer depending upon the facts of the particular case. See 29 C.F.R. § 791.2(a). Under the Department of Labor's regulations, a joint employment relationship may exist where an employee "performs work which simultaneously benefits two or more employers" and most often arises in the following situations:

> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees;
> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

Id. § 791.2(b) (footnotes omitted).

The Eleventh Circuit has held that to determine whether someone is jointly employed, courts look to "each employment relationship as it exists between the worker and the party asserted to be a joint employer." Layton v. DHL Express (USA), Inc., 686 F.3d 1172, 1177 (11th Cir. 2012). The existence of a joint employment relationship "depends on the economic reality of all the circumstances" and whether those circumstances demonstrate economic

dependence. Id. (quoting Atenor v. D & S Farms, 88 F.3d 925, 932 (11th Cir. 1996). Eight nonexclusive factors guide the Court's inquiry: (1) the nature and degree of control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the power to determine the pay rates or methods of payment of the workers; (4) the right, directly or indirectly, to hire, fire or modify the employment conditions of the workers; (5) preparation of payroll and payment of wages; (6) ownership of facilities where work occurred; (7) performance of a specialty job integral to the business; and (8) investment in equipment and facilities. Id. at 1176. Importantly, no one factor is determinative. Id. at 1177.

### 1.    Control

The first factor is the nature and degree of control. Id. at 1178. "Control arises when the purported joint employer goes beyond general instructions and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work." Id. (quotation omitted and alterations adopted). An alleged employer takes an overly active oversight role when it decides things such as "(1) for whom and how many employees to hire; (2) how to design the employee's management structure; (3) when work begins each day; (4) when the laborers shall start and stop their work throughout the day; and (5) whether a laborer should be disciplined or retained." Id. (quotation omitted).

As the Court set out above, there are genuine disputes of material fact as to this issue. The parties dispute whether Defendant DirecTV assigned Plaintiffs daily work orders using Siebel; required Plaintiffs to be on-site at their first job of

the day by 8:00 A.M; and required any days that Plaintiffs took off to be reported to Defendants and recorded in the Siebel system. Dkt. No. [174-1] ¶¶ 41, 44–45, 58. Additionally, Defendants imposed mandatory standards upon Plaintiffs for how to perform their work orders, how to speak to customers, how to dress, and what car to drive. Id. ¶¶ 46, 54–56. Plaintiffs were also subject to periodic inspections by Defendant DirecTV's auditors. Id. ¶ 89. Cf. Layton, 686 F.3d at 1178 (finding against joint employment where the defendant "did not involve itself with the specifics of how [its] goals would be reached").

Defendants point out that the subcontracting companies hired each Plaintiff and that Defendants had no role in the hiring process or discipline process of each Plaintiff. Dkt. No. [116-1] at 37, 42. While the Court agrees there is no evidence to indicate Defendants were directly involved in the hiring process of each Plaintiff, there are genuine disputes of material fact over the extent to which Defendants were indirectly involved in the hiring process. For starters, it is disputed whether Defendants imposed hiring guidelines on the subcontractors and audited their hiring processes. See Dkt. No. [174-1] ¶¶ 87–88. And as set out above, Defendant DirecTV's contracts required that Defendant MasTec and other contractors hire only technicians who successfully complete Satellite Broadcasting and Communications Association Certified Installer Training; complete a criminal background check; pass a 9-panel drug screening test; and complete a DirecTV-approved training program. Dkt. Nos. [142-10] at 27–28; [174-1] ¶ 9c. Defendant DirecTV also concedes it provided forecasted workforce

needs for technicians. Dkt. No. [174-1] ¶ 85. The Court therefore finds that there are genuine disputes of fact too great for the Court to make a finding on this factor on summary judgment.

### 2.    *Degree of Supervision*

The next factor is the degree of supervision, direct or indirect, of Plaintiffs' work. Layton, 686 F.3d at 1178. "Supervision can be present regardless of whether orders are communicated directly to the alleged employee or indirectly through the contractor." Id. at 1178–79. However, "infrequent assertions of minimal oversight do not constitute the requisite degree of supervision." Martinez-Mendoze v. Champion Int'l Corp., 340 F.3d 1200, 1211 (11th Cir. 2003).

The Court's analysis with regard to this factor is informed by the Eleventh Circuit's decision in Layton. In Layton, the plaintiffs were delivery truck drivers for a contractor of DHL, a shipping servicer. See 686 F.3d at 1173. The plaintiffs in that case "spent the majority of their days by themselves in their trucks" but DHL subjected them to audits, collected information on their package deliveries throughout the day, and evaluated their performance. See id. at 1179. The Eleventh Circuit found that "these actions evidence a small amount of supervision," but recognized at the same time that the plaintiffs "were basically unsupervised while completing their most essential job function which took up the majority of the workday." Id. Given these circumstances, the Layton court held that "this factor is not strongly probative of joint employment." Id.

The Court finds the facts in this case are very similar, and require the same result. Defendants concede that through the Siebel system, Plaintiffs reported when they arrived at each customer location and completed each job. Dkt. No. [174-1] ¶ 57.[7] Defendant MasTec concedes it produced a daily report showing its technicians overall impact on Defendant DirecTV's performance level that included detail at the individual technician level. Id. ¶ 64. Defendants also admit to quality control checks that were in place such as post-installation surveys, technician scorecards, and quality inspections. Id. ¶¶ 67–68, 70–71. However, Defendants argue that their oversight was minimal and limited to check-ins. Dkt. No. [116-1] at 45–46. Plaintiffs do not dispute that, outside of this monitoring, they performed their work independently in the field. See Dkt. No. [172] at 32. The Court therefore finds that this factor is neutral. Cf. Layton, 686 F.3d at 1179.

### 3. Pay Rates

The third factor the Court considers is Defendants' power to set Plaintiffs' pay rates or payment methods. Id. The parties agree that Defendant DirecTV paid its contracted companies, including Defendant MasTec, on a piece-rate basis— that is, a fixed amount of money for the action performed regardless of the amount of time. See Dkt. No. [174-1] ¶¶ 75–76. Defendant MasTec also paid its subcontracting entities on a piece-rate basis. See id. ¶ 78.

There is no dispute that each subcontractor had its own payment policy for Plaintiffs and that Defendants did not set each Plaintiff's individual pay rate.

---

[7] However, Defendants dispute the accuracy of all of the Siebel data.

Plaintiffs argue, however, that as a matter of economic reality, Defendants controlled their pay because it was based on the piece-rate payments by Defendants. Dkt. No. [172] at 36. Plaintiffs argue that Defendant DirecTV could also issue chargebacks for poor performance that were passed onto them. Dkt. No. [174-1] ¶¶ 79–81. Defendants deny any involvement in how subcontractors paid their technicians, and also dispute whether the chargebacks were indeed passed onto Plaintiffs. Id.; Dkt. No. [116-1] at 49. The Court thus finds that there are genuine disputes of material fact as to Defendants' influence on Plaintiffs' rate of pay.

### 4. *Power to Hire, Fire, or Modify Conditions of Employment*

The fourth factor is Defendants' right, directly or indirectly, to hire, fire, or modify Plaintiff's employment conditions. Layton, 686 F.3d at 1179. As the Court recognized in considering the control factor, there are genuine issues of material fact as to the extent to which Defendants were indirectly involved in the hiring process.

### 5. *Preparation of Payroll and Payment of Wages*

The fifth factor the Court considers is whether Defendants' prepared payroll and payment of Plaintiffs' wages. Id. It is undisputed that the subcontractors paid Plaintiffs. Dkt. No. [172] at 41.[8] The Court therefore finds this factor favors Defendants.

---

[8] Plaintiffs briefly assert that there is mixed evidence on this factor because their payroll checks were prepared by accessing Defendants' records. Dkt. Nos. [172] at

### 6. *Ownership of Facilities*

The sixth factor is the ownership of the facilities where the work occurred. <u>Layton</u>, 686 F.3d at 1180. Plaintiffs do not dispute this factor, admitting that their work occurred in the homes of customers. Dkt. No. [172] at 53. The Court therefore finds this factor favors Defendants.

### 7. *Specialty Job Integral to the Business*

Seventh, the Court considers whether the Plaintiffs' performance of a specialty job was integral to Defendants' business. <u>Layton</u>, 686 F.3d at 1180. This factor is derived from the Supreme Court's decision in <u>Rutherford</u>, in which the Court held that the plaintiffs in that case were joint employees of the defendant because they completed one process in the middle of a series of interdependent steps. <u>Id.</u> (citing <u>Rutherford</u>, 331 U.S. at 729–330). This led the Supreme Court to determine the workers "did a specialty job on the production line" that was "more like piecework than an enterprise that depended for success upon the initiative, judgment or foresight of the typical independent contractor. " <u>Rutherford</u>, 331 U.S. at 730. Because these plaintiffs were "part of the integrated unit of production" for the defendant, they were held to be joint employees. <u>Id.</u> at 729.

In contrast, the Eleventh Circuit in <u>Layton</u> acknowledged that the delivery drivers "certainly performed a crucial task for DHL," but nonetheless this factor did "not strongly support a conclusion that a joint-employment relationship exists." 686 F.3d at 1180. The panel found the delivery truck drivers were less

---

42; [174-1] ¶ 97. However, this fact, which Defendants concede, does not change that it was the subcontractors who prepared the payroll and paid Plaintiffs.

integral to DHL's business because they performed most of their work away from DHL facilities and supervision and did not work alongside DHL employees. See id. The Layton court also pointed out that the drivers operated vehicles that DHL did not own and that they were not contractually restricted from using their vehicles to work for other delivery companies. Id.

As set out in the employee-independent contractor discussion before, Defendants concede that Plaintiffs' work was integral to their business. Dkt. No. [174-1] ¶ 118. Neither do Defendants dispute that installation technicians, including Plaintiffs, are often the only representatives of Defendant DirecTV that have personal contact with customers. Dkt. No. [174-1] ¶ 119. On the other hand, like Layton, Plaintiffs spent most of their time in the field, driving their own vehicles, and did not work alongside Defendants' employees. However, one of the key facts in Layton—that the plaintiffs could work for the defendant's competitors using their vehicles—is in dispute in this case. See Dkt. No. [174-1] ¶ 107 (disputing whether Plaintiffs were held to an exclusivity provision). The Court therefore finds there is a genuine issue of material fact as to this factor.

### 8.     *Investment in Equipment and Facilities*

The eighth and final factor considers Defendants' and the subcontractors' relative investments in equipment and facilities. Layton, 686 F.3d at 1181. This factor is considered "because workers are more likely to be economically dependent on the person who supplies the equipment or the facilities." Id.

The Court finds that this factor is neutral. Plaintiffs provided their own vehicles, tools, and supplies. The subcontractors provided offices and storage space. And Defendants provided the equipment that was installed in customers' homes. Although Plaintiffs point out Defendants invested a considerable amount of money in establishing a distribution network, see Dkt. No. [172] at 43, this investment must be divided among the thousands of technicians it was designed to serve. Because both sides "made significant investments in facilities and equipment, this factor does not aid [the] joint-employment inquiry." See Layton, 686 F.3d at 1181.

### 9. Conclusion

In sum, two factors favor Defendants, one factor is neutral, and five factors are the subject of genuine disputes of material fact. Because a majority of the factors guiding the Court's analysis are in dispute, the Court concludes that summary judgment on this basis is not appropriate.

### C. Section 207(i) Exemption[9]

Defendant DirecTV asserts that, even assuming Plaintiffs are its joint employees, Plaintiffs fall within FLSA Section 207(i)'s exemption. Under the FLSA, employers are required to pay their employees overtime compensation for hours worked in excess of 40 hours per week at a rate not less than one and one-half times the employees' regular rate unless an exemption applies. 29 U.S.C.

---

[9] The Court considers this defense only as to Defendant DirecTV as Defendants have offered no argument or evidence for how it might apply to Defendant MasTec.

§ 207(a)(1). One of these exemptions is Section 207(i), which applies to commissioned employees of retail or service establishments. It provides:

> No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

Id. § 207(i).

Defendant DirecTV, "as the employer, bears the burden of proving the applicability of a FLSA exception by 'clear and affirmative evidence.'" Klinedinst v. Swift Invs., Inc., 260 F.3d 1251, 1254 (11th Cir. 2001) (quoting Birdwell v. City of Gadsden, 970 F.2d 802, 805 (11th Cir. 1992)). "Exemptions from the overtime provisions of section 207 are to be narrowly construed against" employers and "should be interpreted liberally in the employee's favor." Birdwell, 970 F.3d at 805. Further, any exemption "is to be applied only to those clearly and unmistakably within the terms and spirit of the exemption." Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1269 (11th Cir. 2008) (quotation omitted).

Defendant DirecTV must establish three elements for this exemption to apply: (1) it is a "retail or service establishment"; (2) more than half of Plaintiffs' compensation for the representative period was from commissions; and (3)

Plaintiffs' regular rate of pay is at least one and one-half times the minimum wage. <u>See</u> 29 U.S.C. § 207(i). The Court will address each element in turn.

### 1. *Retail or Service Establishment*

Section 207(i) itself lacks any definition of "retail or service establishment." In the absence of a statutory definition, the district courts in this circuit have applied the definition from the Department of Labor's ("DOL") regulations, despite the fact that it is derived from Section 213(a)(2) of the FLSA, which was repealed in 1989. <u>See</u> <u>Jones v. Tucker Commc'ns, Inc.</u>, No. 5:11-CV-398, 2013 WL 6072966, at *5 (M.D. Ga. Nov. 18, 2013); <u>Russell v. Promove, LLC</u>, 1:06-CV-00659-RWS, 2009 WL 1285885 (N.D. Ga. May 5, 2009).[10] The DOL's regulations provide the following definition: "[T]he term 'retail or service establishment' means an establishment 75 per centum of whose annual dollar volume of sale of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." 29 C.F.R. § 779.411. The regulations also explain:

> Typically a retail or service establishment is one which sells goods or services to the general public. It serves the everyday needs of the community in which it is located. The retail or service establishment performs a function in the business organization of the Nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does

---

[10] The parties note that the Seventh Circuit recently reached a different definition of "retail or service establishment." <u>See</u> <u>Alvarado v. Corp. Cleaning Servs., Inc.</u>, 782 F.3d 365, 370–71 (7th Cir. 2015). However, the parties agree that the district courts in this circuit apply the definition from the DOL's regulations, and that it should control here. Most other circuits also apply this definition. <u>See</u> <u>Gieg v. DDR, Inc.</u>, 407 F.3d 1038, 1047–49 (9th Cir. 2005); <u>Reich v. Delcorp, Inc.</u>, 3 F.3d 1181, 1183 (8th Cir. 1993).

> not take part in the manufacturing process. . . . Illustrative of such establishments are: Grocery stores, hardware stores, clothing stores, coal dealers, furniture stores, restaurants, hotels, watch repair establishments, barber shops, and other such local establishments.

Id. § 779.318; see also id. § 779.320 (providing a partial list of establishments that may be retail); id. § 779.317 (providing a partial list of establishments lacking retail concept).

Based off this definition, Defendant DirecTV needs to establish two components to show their business was a "retail or service establishment." See Jones, 2013 WL 6072966, at *5–7. First, it must show its sales were not for resale. This includes showing that at least 75% of its revenue came from those sales. Second, it must show its sales were recognized as retail in the particular industry.

### a.   Not for Resale

The Court finds that Defendant DirecTV has met its burden in establishing that its sales of satellite television service are not for resale. The parties do not dispute that Defendant DirecTV sells satellite television services to an end user that cannot be resold or that 75% of its revenue comes from these sales. Dkt. Nos. [172-1] ¶¶ 11–12; [172] at 48–49. Instead Plaintiffs argue that the Court must consider only the sales level upon which they worked—satellite equipment installations—and not Defendant DirecTV's entire enterprise. Dkt. No. [172] at 48–49. Plaintiffs contend that once this scope is applied to the Court's inquiry, Defendant DirecTV cannot meet its burden because the installations were free to consumers and thus no revenue was derived from them. See id.

However, Plaintiffs have not pointed to any legal support for this notion. Indeed, nearly every other district court to look at this issue has recognized that there is no genuine issue of material fact as to whether Defendant DirecTV's business is selling satellite television services or whether over 75% of its revenue is derived from those sales. See, e.g., Roeder v. DirecTV, Inc., No. C14-4091-LTS, 2017 WL 151401, at *28–29 (Jan. 13, 2017 N.D. Iowa) (making this finding and citing numerous cases in which courts have concluded cable companies are "retail or service establishments"); Matrai v. DirecTV, LLC, 168 F. Supp. 3d 1347, 1359–60 (D. Kan. 2016).

### b. Retail Concept

The Court also finds that Defendant DirecTV has met its burden in establishing that it had a retail concept that was recognized in its industry. Defendant DirecTV has provided a declaration from Steven Hill, the Deputy Executive Director of the Satellite Broadcast and Communications Association, a national trade organization. Dkt. No. [116-4]. Mr. Hill, who has worked in the industry for over 20 years, states that Defendant DirecTV's "sale of satellite service and equipment . . . to consumers through retail outlets (*i.e.*, on-line, telephonic call center facilities, or brick and mortar locations), and the services performed by technicians to fulfill the retail transaction" "are generally recognized as 'retail' in our industry." Id. ¶¶ 2, 4. Plaintiffs dispute that Mr. Hill's testimony is dispositive, however, pointing to conflicting testimony from two of Defendant DirecTV's HSP's executives. See Dkt. No. [172-1] ¶ 11. The Court finds

that while these executives' testimony may create a genuine issue of fact as to each of their particular HSP's business, it is not illuminating as to Defendant DirecTV's business. The executives relied upon by Plaintiffs were only asked about their own businesses—not Defendant DirecTV's business. In contrast, Mr. Hill's testimony speaks directly to Defendant DirecTV's services being recognized as retail in the relevant industry. The Court therefore concludes that Defendant DirecTV has met its burden in demonstrating it is a "retail and service establishment" for purposes of Section 207(i).

### 2. Commissions

The second element Defendant DirecTV must establish is that more than half of Plaintiffs' compensation for the representative period was from commissions. As set out above, Plaintiffs were paid on a piece-rate basis in which they each received a fixed amount of money for the action performed regardless of the amount of time. The Eleventh Circuit has held that "flat rate" pay structures may be viewed as commissions for purposes of Section 207(i) if that pay structure provides "incentives for employees to work efficiently and effectively to the benefit of the employer, who may then take on more customers at a greater profit margin, and the employee, who reaps the benefits of increased [pay] regardless of the actual amount of hours worked." Klinedinst, 260 F.3d at 1256.

The Court finds there is a genuine issue of material fact as to this element of Section 207(i). In order for Plaintiffs' piece-rate pay structure to qualify as a

commission, Plaintiffs must be able to take on additional customers and earn more. See id. Whether this was possible in practice is the subject of dispute as Plaintiffs testified that they were not always able to get additional work orders. See Dkt. No. [172] at 51–52 (citing testimony from Plaintiffs Amponsah, Exum, Hodges, and Tchaas). This evidence casts doubt upon whether Plaintiffs were truly incentivized to work efficiently and receive extra work orders. As a result, Defendant DirecTV has not met its burden in showing this required element for Section 207(i).

### 3. *Regular Rate of Pay*

The third element Defendant DirecTV must establish is that Plaintiffs' regular rate of pay was at least one and one-half times the minimum wage. The "regular rate of pay" is determined by dividing the employer's total compensation during the workweek by the number of hours worked. Klinedinst, 260 F.3d at 1256.

The Court finds that Defendant DirectTV has not met its burden on this element as well. Defendant DirecTV's evidence for this element is based off of Plaintiffs' initial disclosures, which contained reasonable estimates of their time. Dkt. No. [116-1] at 64 n.164. However, Plaintiffs have since provided supplemental disclosures with revised estimates of their hours. See Dkt. No. [174-1] ¶¶ 154–61. While Defendants dispute the admissibility of these supplemental disclosures, in any event, Defendant DirecTV has not met its burden of proof in providing clear and affirmative evidence. See Klinedinst, 260 F.3d at 1254. This is

particularly so where Defendant DirecTV, as the employer, was obligated to maintain and preserve records of Plaintiffs' regular hourly rate of pay. <u>See</u> <u>id.</u>; 29 U.S.C. § 211(c). And where an employer cannot provide such records, the Eleventh Circuit has held that "factual inquiries preclude the legal determination of whether the section 207(i)(1) element of the overtime payment exception is satisfied." <u>Klinedinst</u>, 260 F.3d at 1254. Accordingly, the Court concludes that Defendant DirecTV is not entitled to summary judgment on the basis of the Section 207(i) exemption.

### D. Actual or Constructive Damages

The fourth reason for summary judgment raised by Defendants is that they argue Plaintiffs cannot show that either Defendant had actual or constructive knowledge of their alleged overtime. In order to prevail on their FLSA overtime claims, Plaintiffs must show that Defendants "knew or should have known of the overtime work." <u>Allen v. Bd. of Pub. Educ.</u>, 495 F.3d 1306, 1314–15 (11th Cir. 2007). The Eleventh Circuit has held that "an employer's knowledge is measured in accordance with his duty to inquire into the conditions prevailing in his business." <u>Reich v. Dep't of Conservation & Nat. Res.</u>, 28 F.3d 1076, 1082 (11th Cir. 1994) (quotations omitted and alterations adopted). The Court's inquiry is "whether the *circumstances* were such that the employer either had knowledge of overtime hours being worked or else had the opportunity through reasonable diligence to acquire knowledge." <u>Id.</u> (quotations omitted and alterations adopted).

It is undisputed that through the Siebel system, Plaintiffs reported when they arrived at each customer location and completed each job. Dkt. No. [174-1] ¶ 57. Although Defendants dispute whether the Siebel data was accurate as to the amount of time that Plaintiffs actually worked, see id. ¶¶ 57, 162–69, at the very least they had knowledge of the number of work orders each technician completed. The Court finds that Defendants therefore had the opportunity through reasonable diligence to acquire knowledge of Plaintiffs' hours. See Reich, 28 F.3d at 1082. And further, if the disputed Siebel time data is indeed accurate, then Defendants had actual knowledge of Plaintiffs' hours. This genuine dispute of material fact also precludes summary judgment. The Court therefore finds that summary judgment on this basis is not warranted.

### E.    Provable Damages

Defendants' fifth basis for summary judgment is that Plaintiffs cannot prove they are entitled to any damages. Under the FLSA, Plaintiffs have the initial burden of proving they performed work for which they did not receive proper overtime compensation. See Anderson v. Mt. Clemens Pottery Co., 382 U.S. 680, 686–87 (1946), superseded by statute on other grounds as stated in Bonilla v. Baker Concrete Constr., Inc. 487 F.3d 1340, 1344 n.6. (11th Cir. 2007). This initial burden can be met by securing production of the employer's records. Id. at 687. "But where the employer's records are inaccurate or inadequate," the Supreme Court had held that the employee's burden is relaxed and Plaintiffs need only produce "sufficient evidence to show the amount and extent of [their alleged

unpaid] work as a matter of just and reasonable inference." Id. The burden then shifts to Defendants to provide "evidence of the precise amount of work to be performed or with evidence to [negate] the reasonableness of the inference to be drawn from the employee's evidence." Id. at 687–88.

Defendants assert that Plaintiffs have not met their burden because their estimates of their working time have been imprecise and inconsistent throughout this matter. Dkt. No. [116-1] at 67–69. Defendants argue that Plaintiffs have therefore not met their burden because their evidence is not "competent." Id. at 69. However, Defendants concede that Plaintiffs have indeed provided estimates—inconsistent as they might be—throughout the litigation process, including more recent and more specific damages estimates. Id. at 69. The Court declines to make credibility determinations as to the competency of Plaintiffs' evidence on summary judgment. See FindWhat Investor Grp. v. FindWhat.com, 685 F.3d 1282, 1307 (11th Cir. 2011) ("On summary judgment, a court may not weigh conflicting evidence or make credibility determinations of its own."). As a result, the Court finds summary judgment is not warranted on this basis.

### F. Statute of Limitations

Last, Defendants argue that some of Plaintiffs' claims are outside the applicable statute of limitations. Dkt. No. [116-1] at 70. Claims brought under the FLSA that accrued after May 14, 1947—all claims in this case—are subject to either a two-year statute of limitations, or in the case of a "willful violation," a three-year statute of limitations. 29 U.S.C. § 255(a). Defendants argue that even if

they violated the FLSA, any violation was not "willful," and therefore Plaintiffs' claims outside of the two-year statute of limitations should be bared. Dkt. No. [116-1] at 70.

The Supreme Court has held that a FLSA violation is "willful" where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." <u>McLaughlin v. Richland Shoe Co.</u>, 486 U.S. 128, 133 (1988). And the Eleventh Circuit has accepted the definition of "reckless disregard" as the "failure to make adequate inquiry into whether the conduct is in compliance with the Act." <u>Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.</u>, 515 F.3d 1150, 1163 (11th cir. 2008) (quoting 5 C.F.R. § 555.104). The Court finds that willfulness is a question of fact best left to the jury, particularly because a finding of willfulness will be impacted by the many genuine issues of material fact the Court has recognized in this Order. <u>See</u> <u>id.</u> 1163 n.3. As a result, summary judgment will not be granted.[11]

## IV.   CONCLUSION

In accordance with the foregoing, the Court **DENIES** Defendants' Motion for Summary Judgment [116]. The Parties are **DIRECTED** to submit their proposed pre-trial order within 30 days of the date of this Order.

---

[11] In a footnote at the end of their brief in support of summary judgment, Defendants assert that they are "entitled to judgment as a matter of law that the date from which the applicable statute is measured for Plaintiff Pegues is December 23, 2013." Dkt. No. [116-1] at 70 n.175. However, Defendants have not provided any legal authority to support their argument nor made clear what the impact of such a ruling would be. The Court finds that this request has not been properly presented and declines to rule on the issue.

**IT IS SO ORDERED** this 4th day of October, 2017.

LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE